

RECEIVED-CLERK
U.S. DISTRICT COURT

2003 FEB -4  P 2: 23

McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102
(973) 622-4444
Attorneys for Plaintiff,
Robert Yontef

FILED

AT 8:30 $2-4-03$
WILLIAM T. WALSH M
CLERK

| ROBERT YONTEF, | : UNITED STATES DISTRICT COURT |
| --- | --- |
| | : FOR THE DISTRICT OF NEW JERSEY |
| Plaintiff, | : CIVIL ACTION NO. $03-504$ |
| | : $(W JM)$ |
| vs. | : |
| | : |
| WESTMINSTER MANAGEMENT, LLC, | : **COMPLAINT AND JURY TRIAL DEMAND** |
| d/b/a KUSHNER COMPANIES, | : |
| CHARLES KUSHNER, AND RICHARD | : |
| STADTMAUER | : |
| | : |
| Defendants | : |

Robert Yontef ("Yontef"), by and through his attorneys,

McCarter & English, LLP, by way of Complaint against Defendants

Westminster Management, Charles Kushner, and Richard Stadtmauer

(collectively, the "Defendants") for illegal retaliatory

discharge and illegal discrimination, avers and states:

## THE PARTIES

1.   Robert Yontef ("Yontef") is 54 years old; he resides

at 50 Lorelei Road, West Orange, New Jersey.  Yontef was the

Accounting Manager at the Kushner Companies until he was
terminated in November 2002.

2.    Upon information and belief, defendant Westminister
Management LLC is d/b/a Kushner Companies (the "Kushner
Companies") is a real estate management and development company,
with a principal place of business at 18 Columbia Turnpike,
Florham Park, New Jersey.

3.    Upon information and belief, defendant Charles Kushner
("Charles") is a principal of the Kushner Companies whose
principal place of business is 18 Columbia Turnpike, Florham
Park, New Jersey.

4.    Upon information and belief, defendant Richard
Stadtmauer ("Stadtmauer") is a principal of the Kushner
Companies whose principal place of business is 18 Columbia
Turnpike, Florham Park, New Jersey.

                    JURISDICTION AND VENUE

5.    This action arises under the Age Discrimination in
Employment Act (ADEA), 29 U.S.C. §621 et seq., and other related
laws of the State of New Jersey. Subject matter jurisdiction is
conferred upon this Court by 28 U.S.C. §1331. In addition, the
Court has jurisdiction over the state law claims pursuant to 28
U.S.C. §1367.

6. Venue is properly laid in the District of New Jersey pursuant to 28 U.S.C. §1291(b) since the Defendants are doing and transacting business within this jurisdictional district.

## GENERAL ALLEGATIONS

7. From February 1999 to November 2002, Yontef was employed as the Accounting Manager by the Kushner Companies.

8. As the Accounting Manager, Yontef was responsible for overseeing the accounting and bookkeeping procedures for all the real estate entities (the "Entities") managed by the Kushner Companies.

9. Charles' family owns many of the Entities managed by the Kushner Companies.

10. Charles is currently involved in an arbitration with his brother Murray and other members of the family over Charles' illegal activities and mismanagement in connection with the Entities.

11. Yontef was a witness to many of the illegalities and wrongful activities that took place at the Kushner Companies to the prejudice of the general public, the IRS, and Charles' own partners and family members.

12. Yontef alerted his supervisors about the wrongful activities and he was told to do as instructed. Other employees such as Alan Lefkowitz, a former CFO of the Kushner Companies,

-3-

were also told to do as instructed when they reported wrongful activities to the top managers.

## I. CHARLES KUSHNER'S FRAUDS AGAINST HIS PARTNERS, TENANTS AND THE IRS

### A. Misallocation of Bills and Invoices

13. Each Entity that Charles manages is set up as an independent partnership or limited liability Company. Charles has established separate service companies, which he controls and primarily owns, to manage and service the Entities, which often have different partners.

14. The bills and invoices which come in from vendors and professionals are either paid directly by an Entity or, in many instances, by one of Charles' management services entities, frequently Westminster Management Disbursements ("WMD"). When WMD paid an invoice, that charge would then be allocated among the Entities, which reimbursed WMD.

15. The way the invoices are allocated is determined by Charles or by Richard Stadtmauer, who is Charles' brother-in-law and runs the operation of the Kushner Companies on Charles' behalf.

16. Once allocations were decided, Yontef was directed to make them in the books and cut the checks. Yontef was directed to make allocations not based on the services performed for

-4-

particular Entities but on the cash availability of the
Entities.  Thus, Entities that did not benefit from the services
provided would nevertheless often pay for them.

17.  Concerned about these misallocations, Yontef alerted
his supervisors, Scott Zecher and Brian Bentzlin, who told him
to do as he was instructed.

18.  In addition, Yontef was instructed by Charles and
Stadtmauer through Scott Zecher to miscode certain expenses that
were ultimately paid by Entities that received no benefit from
the expenditures.

B.  Inappropriate Personal Charges As Business Expenses and
    Misappropriation of Funds from the Entities

19.  Charles has a business American Express card issued to
himself, his wife, Richard Stadtmauer, Jeffrey Freireich, head
of land development and Gershin Chin, the head of human
resources at the Kushner Companies.  Many of the expenses
charged on these cards, which are personal in nature, are then
allocated to the Entities.  These charges have included hundreds
of thousands of dollars for sporting events, super bowl
packages, play-off tickets, trips, and the like.  Similarly,
personal landscaping bills were paid with Entities funds as if
they were business expenses.

20.  Charles misappropriated funds from some of the
Entities to purchase Highview Planning Insurance Agency for his

-5-

own benefit. Charles eventually returned those funds after his brother Murray, a partner in two of the Entities whose funds had been misappropriated, commenced litigation against Charles.

## C. Diversion of funds from Tenants' Security Deposits

21. Each residential Entity is required by law to place the security deposits that the tenants provide for their apartments in an interest bearing escrow account.

22. Although tenant security accounts existed for each residential Entity, instead of placing those funds into escrow accounts, the funds were deposited into the Kushner Companies operating account.

23. When a tenant moved and it was necessary to reimburse the tenant for the security deposit, a check was issued from the operating account with the interest added on.

24. Part of Yontef's job was to reconcile the tenants' security accounts. Yontef's reconciliation revealed that by July 2001, more than $3 million was missing from the tenants' security accounts.

25. Yontef was severely admonished for informing Tom Martin, the Company's in-house counsel, about the missing funds.

D.    Improper Allocation of Political and Charitable
      Contributions

      26.   Charles made large charitable and political donations.
At times, he had the Entities either directly make a donation to
a charity if it had available funds, or had WMD pay the donation
and allocate it among the Entities.

      27.   Most of these substantial contributions - well into
millions of dollars per year - were made mostly in Charles' name
even though the funds came from the Entities.

      28.   At the end of each year, as part of Yontef's
responsibilities, he would forward to Schonbraum, Safris McCann
Bekritsky & Co. LLC, the Kushner Companies' accountants, the
trial balances which listed all the contributions made by the
Entities.   The completed tax returns (signed by Stadtmauer) for
some of the Entities, however, listed no charitable
contributions whatsoever.

      29.   Charles also contributed millions to politicians and
political organizations.

      30.   Initially, contributions that Charles made through the
Entities were returned because there was a requirement that the
names of partners be given when a partnership makes a political
contribution.   As a result, Charles issued partnership checks
for the contribution and then attributed the contribution to
particular partners.   These partners, however, were not notified

-7-

that certain contributions had been made in their names until after the contributions were made, and in many instances partners were never notified that other political contributions were being made by Charles with partnership funds in their names.

31. Furthermore, Yontef was directed by Charles and Stadtmauer through Zecher to miscode the political and charitable contributions to conceal the disbursement from the Entities that were ultimately paying for the contributions.

E. Doctoring Financial Statements to Obtain Financing
   From Banks

32. In order to obtain and maintain financing from banks, the Entities were required to maintain a certain level of net operating income.

33. Some of the properties were unable to meet the banks' requirements - usually because of the massive improper allocations made by Charles.

34. Richard Stadtmauer would alter, or ask others to alter the financial statements of those Entities to increase the net operating income to satisfy the banks and maintain the financing, thereby making false reportings to the banks. Yontef was asked to change the financial statements to reflect the arbitrary adjustments for various Entities over the last few years.

-8-

F.  Other Misconduct in Connection with Banking Activities

35.  On a daily basis, the Westminster Management disbursement account and the Kushner Companies' payroll accounts were overdrafted.  The overdrafting of those accounts was in violation of banking regulations.

G.  Overcharging the Entities for Management Services

36.  The Entities pay a 5% management fee based on the gross rents of the Entities to Charles' management Companies. The management fee exceeds $5,000,000 per year.

37.  Each Entity also directly pays for its own on-site employees, such as superintendents.

38.  In addition to the management fee and each Entity's direct expenses, the payroll expenses of virtually all of Charles' employees, including executive personnel and headquarters' staff, are paid from and improperly allocated among the Entities.

H.  Improprieties in Connection with Distributions to Partners

39.  Until the fall of 1999, Charles' brother Murray and his family received regular monthly distribution checks from the Entities.

40.  In September 1999, Yontef was told to continue issuing the checks but to void them because the funds due to Murray and

his family were wired to a separate Westminster Funding account at NorCrown Bank that was controlled by Charles. Some of these distributions were then used to meet supposed capital calls on properties in which Murray did not have an interest.

41. Similarly, after humiliating his sister Esther Schulder publicly and after firing Esther's husband, Charles arbitrarily stopped the distributions due to Esther in September 2001 as one of the partners in the Entities.

42. Over the years of Yontef's employment, Charles would make distributions to himself from certain Entities without making proportionate distributions to other partners in those Entities.

I. Misrepresentations Regarding Document Retention Policy

43. Yontef learned that in response to discovery requests made by Murray Kushner in the pending arbitration proceeding against Charles, the latter together with Richard Stadtmauer and other representatives of the Kushner Companies claimed that it was Company policy to destroy many of the financial, accounting, and payroll records.

44. The records, however, existed at the time they were requested. Indeed, Yontef himself had been asked to assemble them in response to the discovery request. Subsequently, Yontef learned through Price Waterhouse, the auditor/monitor imposed on

the Kushner Companies in the arbitration between Charles and
Murray, that many of those records had been destroyed and Price
Waterhouse was attempting to reconstruct them. As part of its
duties, Price Waterhouse repeatedly asked Yontef for help on
finding and resurrecting data that was originally there. Yontef
was also aware that Price Waterhouse was overseeing revenues and
approving expenditures as well as operations through his
conversations with its representatives.

## II. YONTEF DISCLOSES CHARLES' WRONGFUL
## AND FRAUDULENT ACTS TO CHARLES' PARTNERS

45. Concerned over Charles' management of the Kushner
Companies and frustrated by the lack of response from his
immediate supervisors to the wrongful and illegal conduct,
Yontef disclosed Charles' wrongful conduct to Esther Schulder,
who is a friend of Yontef.

46. Esther, in turn, introduced Yontef to her brother
Murray. Yontef also disclosed Charles' wrongdoings to Murray.

47. On or about June 2002, Yontef prepared and signed a
certification (the "Certification") that was filed in the
arbitration proceeding between Murray and Charles. The
Certification revealed many of the illegalities and wrongdoing
perpetrated by the Charles, Richard Stadtmauer and the Kushner
Companies. A copy of the Certification is attached hereto as
Exhibit A and incorporated herein by reference.

-11-

48. Upon learning of (a) Yontef's communications with Esther Schulder and Murray, and (b) the filing of the Certification, and (c) with the immediate threat that the Certification would be made available to a public body, Charles and Stadtmauer personally fired Yontef from the Company on or about June 25, 2002. See Certification of Robert Yontef dated June 25, 2002, attached hereto as Exhibit B and incorporated herein by reference.

49. On June 26, 2002, Charles' attorney reversed the dismissal order and asked that Yontef return to work.

### III. CONSTRUCTIVE RETALIATORY AND DISCRIMINATORY DISCHARGE

50. On June 27, 2002, Yontef reported back to work at the office. His desk had been completely emptied and all its contents were put in boxes inside the office of Scott Zecher. Similarly, all working files were taken away from Yontef's computer. Yontef's access to the office e-mail system was curtailed such that general e-mails sent to distribution lists were not received by Yontef.

51. Yontef's mail--even personal correspondence--was routinely rerouted and opened by other employees at the Company.

52. In addition, Yontef was ostracized. No employee reported to him any more despite the fact that he had previously managed and supervised the work of ten employees. Other

-12-

employees were scolded for talking to Yontef. Larry Glinsky, an employee who left the Company, told Yontef that everybody at the office knew that Yontef had no control, no job, was just there and expected to leave soon.

53. His job assignments were severely limited to discrete technical projects such as helping out with the set up of a new accounting software for the Company. Yontef, who in June 2001, had been named the first Kushner Companies' Employee of the Month, found himself with little or no productive work to do.

54. On or about August 16, 2002, Yontef found that Deborah Ford was hired as Director of Accounting to oversee the accounting department -- essentially a replacement to Yontef in all but in name.

55. On August 20, 2002, without any formal introduction from anyone at the Company, Ms. Ford approached Yontef to get the training she needed for her new position. Yontef trained her for many days. Ms. Ford was young, inexperienced and needed constant instruction and guidance from Yontef.

56. On September 3, 2002, Yontef wrote a letter to Scott Zecher, complaining about the deliberate steps taken to isolate him and to force him out of the Company. A copy of the letter is attached hereto as Exhibit C. He received no response.

57. Days would go by without any work being given to Yontef.

-13-

58. On September 25, 2002, without any warning, the new accounting software, MRI, was removed from Yontef's computer. The next two days, Yontef was asked to do reconciliation of accounts works with paper rather than electronic records, an inefficient, old-fashion way of performing the task.

59. Despite reinstalling the MRI program to Yontef's computer by the end of September, work trickled down to almost nothing during the first two weeks of October, 2002.

60. As work trickled down to nothing, the isolation of Yontef intensified. Despite working on a desk in an open area and seeing the people in the accounting department every day, no one talked to Yontef. Furthermore, when Yontef did talk to Dante Zaragora, a clerk in the accounting department, about some errors in the data base, Ms. Ford got angry and let Yontef know that he should not communicate directly with anyone in the accounting department.

61. Given the isolation, the curtailment of his duties, the lack of meaningful work, and the hiring of a younger and inexperienced replacement, Mr. Yontef had been essentially fired from his position at the Company in retaliation for disclosing wrongdoings to Charles' partners and the threat of disclosing the same wrongdoings to public bodies.

62. The Defendants' harassment tactics continued even after Yontef was fired. Other Kushner employees who have had

-14-

some social contacts with Yontef have been interrogated by the Defendants about those contacts and warned to cut off all communications with Yontef.

63.  On or about November 18, 2002, Yontef filed a charge of discrimination against the Defendants before the United States Equal Employment Opportunity Commission ("EEOC").

64.  On or about January 27, 2003, the EEOC closed its file on the charge and issue a right to sue notice, advising Yontef that he had to file a suit within 90 days of the date of receipt of the notice.  A copy of the EEOC right to sue notice is attached hereto as Exhibit D.

## COUNT I
### (VIOLATION OF ADEA)

65.  At age 53, Yontef was in a protected group under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq.

66.  Yontef was performing his job at a level that met his employer's legitimate expectations.  Indeed, Yontef was performing his job at an exceptional level and the Defendants recognized his achievement by naming him first Employee of the Month in July 2001.

67.  Nevertheless, Yontef was fired by the Defendants and replaced by Ms. Ford, a younger and more inexperienced person to perform the same work after Yontef's termination.

-15-

68. Charles and Stadtmauer directed and assisted the Kushner Companies to fire Yontef and replace him with a younger and more inexperienced person to perform Yontef's job.

WHEREFORE, Yontef demands that judgment be entered in his favor and against the Defendants for compensatory and punitive damages, emotional distress, reinstatement to his position with full responsibilities and benefits, attorneys' fees and costs of suit, and for any other relief that the Court may deem just and fair.

## COUNT II
## (VIOLATION OF LAW AGAINST DISCRIMINATION)

69. Yontef restates and realleges the allegations set forth above and incorporates them herein by reference.

70. At age 54, Yontef was in a protected group under the New Jersey Law against Discrimination (N.J.S.A. 10:5-1 et seq.)

71. Yontef's firing and replacement with a younger, inexperienced employee was in violation of New Jersey Law against Discrimination, N.J.S.A. 10:5-1 et seq.

WHEREFORE, Yontef demands that judgment be entered in his favor and against the Defendants for compensatory and punitive damages, emotional distress, reinstatement to his position with full responsibilities and benefits, attorneys' fees and costs of suit, and for any other relief that the Court may deem just and fair.

-16-

## COUNT III
### (CEPA VIOLATION)

72. Yontef restates and realleges the allegations set forth above and incorporates them herein by reference.

73. Yontef reasonably believed that the Defendants, through Charles and other principals of the Kushner Companies, were engaged in illegal activities.

74. As a result of such belief, and given his direct supervisors complicity or ineffectiveness in dealing with Charles, Yontef disclosed the illegal activities to Charles' partners and threatened to disclose the illegalities to public bodies by signing the Certification.

75. The Defendants took illegal, retaliatory action by constructively dismissing Yontef in violation of N.J.S.A. § 39-19-3.

76. Charles and Stadtmauer encouraged and directed the Kushner Companies to dismiss Yontef to cover up their own individual wrongdoing and illegalities.

77. Yontef has suffered damages as a result of the Defendants' wrongful retaliatory action.

WHEREFORE, Yontef demands that judgment be entered in his favor and against the Defendants for compensatory and punitive damages, emotional distress, reinstatement to his position with full responsibilities and benefits, attorneys' fees and costs of

-17-

suit, and for any other relief that the Court may deem just and fair.

## COUNT IV
## (WRONGFUL RETALIATORY TERMINATION)

78. Yontef restates and realleges the allegations set forth above and incorporates them herein by reference.

79. The retaliatory discharge was a direct violation of a clear mandate of public policy encouraging citizens to report suspected illegalities.

80. As a result of the retaliatory discharge, Yontef has suffered damages.

WHEREFORE, Yontef demands that judgment be entered in his favor and against the Defendants for compensatory and punitive damages, emotional distress, reinstatement to his position with full responsibilities and benefits, attorneys' fees and costs of suit, and for any other relief that the Court may deem just and fair.

## JURY TRIAL DEMAND

Plaintiff hereby demands trial by jury on all counts

of this Complaint.

McCARTER & ENGLISH, LLP
Attorneys for Plaintiff
Robert Yontef

BY: _Xwun D. _____

THEODORE D. MOSKOWITZ
A Member of the Firm

Dated:   February **3** , 2003

-19-

**CERTIFICATION**

I hereby certify that the damages recoverable in this
action exceed the sum of $100,000 exclusive of interest and
costs and any claim for punitive damages. Thus, this action is
not eligible for mandatory arbitration pursuant to Civil Rule
201.1.

I hereby certify that the foregoing statements made by me
are true, and I am aware that, if any of the same is willfully
false, I am subject to punishment.

> McCarter & English, LLP
> Attorneys for Plaintiff,
> Robert Yontef

> BY: _X̄hₘₙ ᴅ. _____

> THEODORE D. MOSKOWITZ
> A Member of the Firm

Dated: February **3** , 2003

NWK2: 1015275.01



Exhibit A

STERN, GREENBERG & KILCULLEN
75 Livingston Avenue
Roseland, New Jersey 07068
(973) 535-1900
Attorneys for Claimants

_____

|  |  |
|---|---|
| MURRAY KUSHNER, ARYEH KUSHNER, MARC S. KUSHNER, JONATHAN KUSHNER, MELISSA KUSHNER, and the Trusts for their Benefit, | : <br> : <br> : <br> : |
|           Claimants, | : |
|      vs. | : |
| CHARLES KUSHNER | :    **CERTIFICATION OF**<br>   **ROBERT YONTEF** |
|           Respondent. | : |

_____

ROBERT YONTEF hereby certifies as follows:

1.      I submit this Certification, based upon my personal knowledge of the facts asserted herein.

## A.    **Background**

2.      I am an accountant by profession.  Since February 15, 1999, I have been employed as the Accounting Manager by the Kushner Companies, which is owned by Charles Kushner ("Charles").  As the Accounting Manager, I am responsible for overseeing the accounting and bookkeeping procedures for the more than 100 real estate entities Charles manages ("Entities").  Charles' brother, Murray Kushner ("Murray"), and Murray's family are partners with Charles and his family and friends in many of these Entities.  As

Accounting Manager, I am familiar with the books and records of the Entities and am responsible for maintaining them. My duties include the processing of bills and invoices issued to the Entities, allocating bills and invoices to be paid by the various Entities, and maintaining and keeping the records of the payments, which include making copies of the bills and placing those copies in the appropriate file.

3.    Each Entity that Charles manages is set up as an independent partnership or limited liability company. Charles has established separate service companies, which he controls and primarily owns, to manage and service the Entities. The bills and invoices which come in from vendors and professionals are either paid directly by an Entity or, in many instances, by one of Charles' management service entities, frequently Westminster Management Disbursements ("WMD"). When WMD pays an invoice, that invoiced charge will then be allocated among the Entities, who then reimburse WMD for their share of the invoice.

4.    The methodology by which the invoices are allocated is determined by Charles or by Richard Stadtmauer, who is Charles' right hand man, and who runs the Kushner Companies operation on Charles' behalf. (Mr. Stadtmauer is also Charles' brother-in-law.) These allocation decisions are made at a regular Tuesday morning meeting routinely conducted at Charles' house. I am not permitted to be present at such meetings.

- 2 -

5.      After Charles and/or Mr. Stadtmauer determine the manner of allocation, that information is conveyed to the CFO of the company, who then directs me how to make the allocations. During my employment by Charles, the CFOs have been Brian Bentzlin, Scott Zecher, followed by Alan Lefkowitz, and then Jeff Goldstein. Mr. Zecher and Mr. Goldstein still work at Kushner Companies. When I am directed to pay a bill, typically a check voucher or request form is prepared which states the payee, the Entity to which the bill is allocated, and if it is more than one Entity, the names of all of those Entities. Many of the invoices which are paid by WMD are allocated by Charles, Mr. Stadtmauer and/or Scott Zecher to almost all of Charles' partnerships, including the ones in which Murray is a partner. For these invoices, the percentage of allocation is rarely, if ever, based on whether any service has been performed for a particular Entity. Instead, the potential rent roll of almost all of the Entities is calculated, and each Entity is allocated a percentage of the total based on its gross potential rent in relation to all the Entities' potential rent roll. (Depending on the nature of the bill, it sometimes may be allocated only among residential properties or among the commercial properties.) For example, if there is a legal bill for $100,000, WMD will pay it and then it will be allocated among the 100+ entities. So, if an Entity such as Quail Ridge makes up 10% of all gross potential rents from the Entities, its allocation for this $100,000 bill would be $10,000, whether or not legal services were performed on its behalf. Sometimes, if a bill is large or if a bill is for services not rendered to any of the Entities (e.g. a personal expense, or a charitable or political expense), even this methodology is abandoned

- 3 -

and the reimbursement allocation is based on which Entities are flush with funds, whether or not the services the invoice represents relates in any way to those Entities.

6. When I first began working for Charles, I became very concerned because expenses were being allocated to Entities which were not responsible for them. It seemed wrong to me to allocate charges to partnerships--and therefore their partners--when it was clear that these charges were unrelated to such Entities and people. When I raised these concerns to my superiors, Scott Zecher and Brian Bentzlin, I was told to do as I was instructed.

## B. Recordkeeping

7. Each time an invoice is received, a check requisition form is created. If the bill was to be paid by one or more Entities, the check requisition form would so indicate, except in circumstances where Charles, Richard or Scott Zecher do not wish the particular invoice identified or characterized. If the bill is to be allocated, many times there are handwritten notations on the check requisition form stating the manner in which it is to be allocated, whether to all the partnerships based on the gross potential rent roll or to specific partnerships based on their financial wherewithal. A copy of the invoice is attached to the check requisition form and these documents, after payment, are filed either with the Entity's records, if the Entity paid directly, or with the records of WMD if the bill has been allocated. All of these records and invoices are, and have always been, maintained and there was never a policy to discard them.

- 4 -

## C. Examples of Allocation

### a. Speakers

8.     At various times, Charles would have guest speakers speak at his home, local synagogue, at events where Charles was given an honorarium, at retreats for his upper management employees or at breakfast meetings for NorCrown Bank (which he owns along with Murray and others). Charles would then allocate the cost of these speakers to the Entities. For example, Benjamin Netanyahu, the former Prime Minister of Israel, spoke at a function honoring Charles, yet his speaking fees, which over the past few years have exceeded $400,000, were allocated to the Entities that had the cash available (and in which Murray is a partner). Most recently, in November 2001, Netanyahu spoke at Charles' local synagogue. Netanayhu was paid $100,000 for this appearance, which was paid from five real estate Entities that had the cash available. These Entities had nothing to do with the event, or with Mr. Netanyahu. Similarly, the speaking fees for former President Bill Clinton ($125,000); for Paul Volker, former head of the Federal Reserve Bank ($50,000); for Terry Bradshaw, a retired professional football player; and for Bobby Valentine, manager of the Mets were allocated for payment by the Entities in which Murray is a partner, but which had no connection with the events at which these persons spoke.

### b. Legal Bills

9.     Legal bills were treated as all other bills described above--i.e., if a service was performed for a particular Entity and that Entity had the funds, that Entity paid the bill. However, if the legal service performed did not relate to any particular Entity or if the Entity

- 5 -

for which the services was performed did not have the funds to pay the bill in question, invariably the legal bill was allocated among all the Entities that had the funds to pay. Prior to January 2002, legal fees were allocated to various Entities sometimes with no description. Since then they have been listed as legal expenses. The legal fees and other costs incurred by Charles in his Arbitration with Murray, as well as the legal proceedings leading up to the Arbitration, were allocated to almost all of the Entities. Since January 2002, Charles' legal and accounting fees in this Arbitration, including the fees of Wolff & Samson and the accountants, Berdon, LLP, have been allocated only to Entities in which Murray is a partner, and the Entities in which Murray is not a partner have been reimbursed by the Murray Entities for the previous bills that they contributed to in 2001.

### c. Accounting Bills

10.     In the beginning of each year, a price was agreed upon with the accounting firm of Schonbraun, Safris, McCann, Bekritsky & Co., LLC ("Schonbraun") for all services to be rendered to Kushner Companies, which was charged to all Entities with no bearing to whether and/or what work was actually performed for any particular Entity.

### d. Jewish Ritual Bath

11.     In recent years, at a cost of $115,000, Charles purchased a house and parcel of land in Livingston, New Jersey on which to build a Jewish ritual bath, which total costs were allocated to the Entities. Furthermore, the yearly real estate taxes, as well as other expenses related to the project were also allocated to some of these Entities.

- 6 -

### e. **Charitable Donations**

12.     Charles receives many solicitations from various charities. At times, he has had the Entities either directly make a donation to a charity if it was flush with cash, or has had WMD pay the donation and allocate it among the Entities. Almost all of the letters from the charities soliciting the donations were kept, as were the records of payment and accompanying correspondence. Most of these substantial contributions--well into millions of dollars per year--were made mostly in Charles' name even though the funds came from the Entities. In fact, in some instances, funds from the Entities were paid to C&S Kushner Foundation, Charles' personal charitable foundation. At the end of each year, as part of my responsibilities, I would forward to our accountants, Schonbraun, the trial balances which would list all of the charitable contributions made by the Entities. I was amazed that when I reviewed some of the completed tax returns for some Entities, there was no listing whatsoever for any charitable contributions.

### f. **Political Contributions**

13.     Since my employment at Kushner Companies, Charles has contributed millions of dollars to politicians and political organizations. Initially, political contributions were made by the Entities. Contributions were often returned by the recipients because there was a requirement that the names of the partners be given when a partnership makes a political contribution. Thereafter, Charles issued partnership checks for the contributions and then attributed the contribution to particular partners, but the partners were not advised that

- 7 -

contributions were being made in their names. It was only <u>after</u> the contributions were made (sometimes years later) that letters were sent to the partners asking them to authorize some of the contributions. In addition, there were massive "soft" political donations that did <u>not</u> need partners' authorization, which were made by Charles and then allocated to the Entities. For example, from the Entity Marlton Building Associates, LLC, a 288 unit apartment house in Marlton, New Jersey, Charles contributed $100,000 to the Democratic National Committee in the summer of 2001.

### g. **Personal Expenses**

14.     Charles has a business American Express card issued to himself, his wife, Richard Stadtmauer, Jeffrey Freireich and Gershin Chin. Many of the expenses charged on these cards, which are personal in nature, are then allocated to the Entities and paid via WMD in the same manner as described above. These charges have included such items as <u>hundreds of thousands</u> of dollars for sporting events, super bowl packages, play-off tickets, trips and the like. For example, just recently in May 2002, Charles bought two tickets to a Billy Joel concert for $2,000 and charged the total bill to Oakwood.


15.     These American Express bills are paid and then kept in a file by me.

- 8 -

### h. Landscaping Bills

16.    When Richard Stadtmauer had his house built in 2001, he had his personal

landscaping bill of $150,000 paid by one of the Entities that owns an office building located

at 18 Columbia Turnpike, Florham Park, New Jersey (in which entity Charles has applied

millions of dollars of Murray's and his children's trusts monies). The landscaping contractor

performed landscaping services for both Kushner Companies and Richard personally.

### i. Payroll

17.    The Entities pay a 5% management fee based on gross rents of the Entities to

Charles' management companies. The management fees exceed $5,000,000 per year. Each

Entity also directly pays for its own on site employees, such as superintendents. In addition

to this management fee and each Entity's direct expenses, the payroll expenses of virtually

all of Charles' employees, including executive personnel and headquarter's staff, are paid

from and allocated among the Entities. All payroll records have been maintained for the last

seven years and I have been so advised by Gerson Chin, head of human resources. I was

recently in the warehouse and saw that the payroll records still exist.

### 4.    Tenant Security Accounts

18.    Each residential Entity is required by law to place the security deposits that the

tenants provide for their apartments in an interest bearing escrow account. Although a tenant

- 9 -

security account is maintained for each residential Entity, instead of placing tenant security deposits into those accounts, much of these funds were diverted into the Kushner operating account. When a tenant moved and it was necessary to reimburse the tenant for the security deposit, a check was issued from the operating account with the interest added on. Every six months, I attempted to reconcile for Mr. Zecher the difference between what was supposed to be in the tenant security accounts and what was missing. Nine months ago, I was told to stop the reconciliation. I was asked by in-house counsel for information about the tenant security accounts. After I gave it to him, I was admonished for doing so. My reconciliations revealed that millions of dollars were missing from the Entities' tenant security accounts--more than $3 million by July 2001. In March 2002, approximately $3.2 million was wired from the tenant security accounts of a separate real estate portfolio owned by Charles (known as WNY), in which Murray has no interest, to Charles' personal account at Valley National Bank. Those funds were then transferred to the tenant security accounts of all the Entities in which Murray is a partner, which made them whole. The records were made to appear as if Charles was making a loan to himself and the transfer to the Entities' security accounts appears to be a loan from Charles. Charles has begun repaying this "loan" by taking distributions from Entities that should have gone to Murray.

## 5.    **Distributions**

19.    Until the fall of 1999, Murray and his family received regular monthly distribution checks from the Entities, as well as proceeds from the sale and refinancing of many of the Entities. I was told in September 1999, to continue issuing the checks but then

- 10 -

to void them, since moneys due Murray were wired into a separate Westminster Funding account at NorCrown Bank which was controlled by Charles. Comingled into these accounts were not only Murray's distributions, but also his children's monies whose trusts were also partners. These distributions were then wired from these accounts to meet capital calls on other properties, some of which Murray has no interest in. Furthermore, over the years while I was employed, from time to time Charles made distributions to himself from certain Entities without making proportionate distributions to the other partners in those Entities.

## 6.    **Highview Planning**

20.    Highview Planning Insurance Agency was purchased by Charles from Gary Taffet, currently Governor McGreevey's Chief of Staff, for \$3.4 million. Although this insurance agency has nothing to do with two real estate Entities in which Murray is a partner, River Club and Curling Club, \$2 million was borrowed from those Entities to purchase this insurance agency. Since September 2001, after Murray commenced the litigation, these monies were repaid; \$1 million was repaid in March 2002 after the Arbitration began.

## 7.    **Maintenance of Records**

21.    Earlier this year, I was told by Scott Zecher that in the arbitration process between Murray and Charles, Murray had requested the records of the Entities, including all invoices and bills from 1995 through 2001. Around February 1, 2002, I was asked to assemble the records of Quail Ridge, one of the Entities in which Murray is a partner, including the payroll allocation records and all of the invoices and bills, because Murray would be reviewing those records the following week. All of the payroll allocation records,

- 11 -

bills and invoices for all of the years in question for this Entity existed because the policy

was to maintain all of these records. I then proceeded to collect the records. The 1995

through 1997 records for the Entities were kept in a trailer at Charles' office until moved to a

public warehouse and the records for 1998 through 2001 are kept in the basement of Charles'

office. I went to both locations and collected all of the records for 1995 through 2001. I

brought the Quail Ridge records to Scott Zecher and Richard Stadtmauer for their review.

Before I gave them these records, I thoroughly looked through the boxes of the records and

determined that substantially all of the underlying bills that Quail Ridge had paid were there,

including professional bills as well as records of charitable and political contributions. I also

gathered and gave to Scott Zecher and Richard Stadtmauer the payroll allocation records and

all records of WMD for those years, which included all underlying invoices for professional

fees and records of political and charitable contributions. Shortly thereafter, I learned that

when Murray's representatives examined the records the following week, they were told that

the bills and invoices for professional services were destroyed. I knew this wasn't true as I

had just seen those records and, of course, it was our policy to maintain these records.

22. When the records for Oakwood, another Entity in which Murray is a partner,

were requested, I collected them on April 11 and April 12, 2002, as I had done with Quail

Ridge in February 2002. That is, I went to the warehouse for the 1995-1997 records and to

the basement for the 1998 through 2001 records. I again looked through the boxes and saw

that all of the bills and invoices for this Entity were there as well. I also gathered the payroll

- 12 -

allocation records and all records of WMD for those years, which included all underlying

invoices for professional fees and records of political and charitable contributions. Over the

following weekend, Richard Stadtmauer, Jeff Freireich and Scott Zecher reviewed those

records, including the bills and invoices, and I saw them doing that. These records were to

be produced to Murray's accountants on the following Monday, April 15, 2002. Immediately

afterwards, I again learned that Murray's representatives were informed by Scott Zecher that

it was not the policy of Charles to maintain bills and invoices for professional fees or records

of charitable contributions and all of those had been destroyed when the tax returns were

filed. This not only was not the policy, but these records were in existence when I gave them

to Scott Zecher and Richard Stadmauer on April 11 and 12, 2002. I recently saw that the

boxes in which these records were contained are still in the basement of Charles' offices.


23.     Included in the boxes of records of WMD, for each year, were copies of check

requests, invoices and the vouchers. These original check request forms, as well as the

invoices and notations on them (many of which contain handwritten instructions) are critical

in order to determine whether the services performed were appropriately allocated to an

Entity. While Charles' computer records will show the payee of a check, in many cases, only

the underlying original check request forms and invoices will show the nature of the service,

the manner of allocation, who authorized what and therefore whether the allocation was

appropriate for a particular Entity.

- 13 -

## 8.     Why I Have Come Forward

24.     Even though I work for Charles, I decided to come forward with all of this information because of all of the wrongdoings I have witnessed.

25.     Charles' sister Esther  and her husband William Schulder, both worked for Charles, and we became very close friends. In January 2000, Esther was verbally abused by Charles in front of the entire office and left his employ. About six months later, her husband was fired.  In September of 2001, I was told by Scott Zecher that Esther's monthly distributions were not being sent to her.  When the distributions were cut off, I asked Scott Zecher what I should tell Esther because I used to personally deliver her distribution check.  I was told to tell her to call Scott Zecher.  I was very disturbed about this and approached Esther and told her how she was being denied her distributions (see ¶19 above). In thinking about everything that went on at the Kushner Companies, I became more and more upset.  I began to tell Esther how Charles was making massive political and charitable donations from the Entities and the other ways he was misallocating and misappropriating the funds of the Entities in which she and her family were partners. After I began telling her these things, she introduced me to her brother Murray and I also told him about the wrongdoings at Kushner Companies described in this certification.  Over the next months, I would occasionally provide Murray with samples of the documents which demonstrate these wrongdoings. When I became aware earlier this year that Charles' representatives were stating that invoices and other documents do not exist because it was Charles' policy to routinely destroy them--

- 14 -

when I knew there was no such policy and that the records had, in fact, been maintained and that I had actually not only seen them but had collected these records immediately before such representations were made--I became even more concerned and began providing Murray with copies of records of the Entities in which he was a partner for fear that they would be destroyed. I felt morally, and legally, obligated to tell Charles' partners the truth about what was being done with their assets. In my view, any other position taken by me would have made me a party to what I will call "misconduct."

I hereby certify the foregoing statements made by me are true. I am aware if any of the foregoing statements made by me are willfully false, I am subject to punishment.

ROBERT YONTEF

Dated: June 18 , 2002

- 15 -

Exhibit B

STERN, GREENBERG & KILCULLEN
75 Livingston Avenue
Roseland, New Jersey 07068
(973) 535-1900
Attorneys for Claimants

|  |  |  |
|---|---|---|
| MURRAY KUSHNER, ARYEH KUSHNER, MARC S. KUSHNER, JONATHAN KUSHNER, MELISSA KUSHNER, and the Trusts for their Benefit, | : | |
| Claimants, | : | |
| vs. | : | |
| CHARLES KUSHNER | : | **CERTIFICATION OF ROBERT YONTEF** |
| Respondent. | : | |

ROBERT YONTEF hereby certifies as follows:

1. I am making this Certification at approximately 6:00 p.m. on June 25, 2002.

2. At approximately 4:30 p.m. today, I was summoned to Richard Stadtmaurer's office. When I arrived, present were Jeff Freireich and Richard Stadtmaurer.

3. When I walked in Richard Stadtmaurer said to me "Why did you do it?" Jeff said "We know you've been talking." I did not say anything. Richard then said "We know about Brian Bentzlin and Alan Lefkowitz." I replied, "So you know everything." Richard then said "Why did you do it, we trusted you. We would have protected you. Why didn't you come to us?"

4.      Richard kept asking me why did I do this and I responded "You will have to

speak with my attorney, Ted Moskowitz of McCarter & English" and I gave him Mr.

Moskowitz' telephone number.

5.      Richard then said "You crucified us. You buried us. We didn't do anything to

hurt you." I then responded that I was just telling the truth and if that hurt them I was sorry.

6.      They then kept questioning me why did I do it and my response was to speak to

my attorney.

7.      I then asked if I could leave. They then asked me to sit down. Richard then

left the room and immediately returned with Charles Kushner. When Charles entered the

room, he said "Why did you do this. You just ruined me. I am going to ruin your life. You

made a big mistake. Get out of here and never come back into my Company again." I then

left the premises.


I hereby certify the foregoing statements made by me are true. I am aware if any of

the foregoing statements made by me are willfully false, I am subject to punishment.

ROBERT YONTEF

Dated:  June 25, 2002

- 2 -

Exhibit C

ROBERT YONTEF
50 Lorelei Road
West Orange, NJ 07052
(973) 731-9574

September 3, 2002

Dear Scott:

I am writing this letter because I feel that purposeful steps have been taken to change and dismiss my job, to isolate me from the work I was hired to do, and to otherwise try to force me out. Additionally, I am, apparently being deliberately underutilized to the detriment of the Kushner Companies- all because of the current disputes between partners, of which disputes I am not a part.

I was hired and worked diligently and well as manager of accounting, supervising the work of ten employees. Now, no one reports to me, I have been denied the chance to perform the job I was selected for, and spend the entirety of my time management imposed isolation. My responsibilities included that of supervising accounts payable and receivable, distribution of partnership distributions, reconciliation of bank accounts and the reconciliation of the Westminster entities among other tasks. Now, I am essentially precluded from that work despite the fact that there has never been an issue with the quality of my work.

The important MRI project has continued with me doing reconciliation work, along with the assignment of training Ms. Debbie Cook, as Director of Accounting. I have been more than willing to perform these duties in spite of the fact that the Cook hiring seems to be just another way to force me out.

Just as in the past, I feel that I can make a significant contribution to the Kushner Companies an should be allowed to do so. I respectfully request that you assign me more work and work that i commensurate with my position, my ability, my experience and the job I was hired to perform.

Very truly yours,

Bob Yontef
Accounting Manager

Cc: Theodore D. Moskowitz, Esq.

Exhibit D

EEOC Form 161 (10/96)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: Mr. Robert Yontef | From: U.S. EEOC, Newark Area Office |
|---|---|
| 50 Lorelei Road | 1 Newark Center, 21st. Floor |
| West Orange, NJ 07052 | Newark, NJ 07102-5233 |

[  ]  *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 171A300121 | Legal Unit | 215.440.2828 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[  ]  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[  ]  Your allegations did not involve a disability that is covered by the Americans with Disabilities Act.

[  ]  The Respondent employs less than the required number of employees or is not otherwise covered by the statues.

[  ]  We cannot investigate your charge because it was not filed within the time limit required by law.

[  ]  Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

[  ]  While reasonable efforts were made to locate you, we were not able to do so.

[  ]  You had 30 days to accept a reasonable settlement offer that afford full relief for the harm you alleged.

[  ]  The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[  ]  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ X ]  Other *(briefly state)*    Complaint filed in NJ court

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must** be filed **WITHIN 90 DAYS** from your receipt of this Notice; otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

*for* Corrado Gigante, Area Director

**JAN 27 2003**

Enclosure(s)

*(Date Mailed)*

cc:   Westminister Management LLC
      Kevin J. Licciardi - McCarter & English, LLP